ESPASAS DAIRY, INC., ET AL., Petitioners, BUENA VISTA DAIRY, INC., ET AL., Petitioners, *v.* MINIMUM WAGE BOARD OF PUERTO RICO, Respondent.

Nos. JSM-65-1, JSM-65-2.     Decided June 20, 1967.

*Enrique Córdova Díaz, Francisco Torres Aguiar, Sarah Torres Peralta, Ginoris Vizcarra,* and *Gustavo A. del Toro* for petitioners. *Ismael Soldevila* and *Rafael Cabello Ortiz* for respondent.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

On April 24, 1965 the Minimum Wage Board promulgated with its approval Mandatory Decree No. 27 applicable to the Dairy and Cattle Industry, Third Revision (1965). In its pertinent part, the Decree provides:

"**Article II—Minimum Wages**

Every employer shall pay his employees a minimum wage not less than the one provided for hereinafter:

| Classification and Occupation | Minimum Wage |
|---|---|
| I. Agricultural Phase | |
| . . . . . . . . | |
| II. Industrial Phase | |
| A. Pasteurization and Homogenization of Milk | |
| 1. . . . . . . . . | |
| | **Based on Wage Per Hour or Piece Rate, Whichever is Higher** |
| 2. Driver-Salesman | $0.95 per hour or $0.0170 (1.70 cents) per quart sold in door-to-door distribution (retail) and $0.0120 (1.20 cents) per quart sold in distribution to business establishments (wholesale). If the driver works with an assistant-salesman he shall be paid $0.95 per hour |

Based on Wage Per Hour or Piece Rate, Whichever is Higher

or $0.00935 (ninety-three and a half hundredths of a cent) per quart sold in door-to-door distribution (retail) and $0.0066 (sixty-six hundredths of a cent) per quart sold in distribution to business establishments (wholesale).

3. Assistant-Salesman

$0.95 per hour or $0.00765 (seventy-six and a half hundredths of a cent) per quart sold in door-to-door distribution (retail) and $0.0054 (fifty-four hundredths of a cent per quart sold in distribution to business establishments (wholesale).

. . . . . . . .

**Article III—Definition of Occupations**

1. **Industrial Phase—Pasteurization and Homogenization of Milk**

   a. Driver-Salesman— employee who drives a motor vehicle and sells and delivers milk on a door-to-door basis to consumers or to business establishments.

   b. Assistant-Salesman—employee who travels with the driver-salesman and sells and delivers milk on a door-to-door basis to consumers or to business establishments."

In addition to the above-copied provisions as to minimum wages the Board entered a note in the Decree that by express

provision of § 40 (b) of Act No. 96 of 1956, all provisions of Mandatory Decree No. 18 applicable to the Dairy Industry in Puerto Rico, effective since January 1, 1951 not related to minimum wages, remained in force and copied said provisions concerning maximum working periods and working conditions.

Petitioners appealed and challenge before us the aforesaid Mandatory Decree. In both petitions for review it is alleged: (1) That the adoption of Mandatory Decree No. 27 by the Board is contrary to law and specifically in violation of Act No. 114 of June 30, 1965; (2) That in adopting Mandatory Decree No. 27 the Committee and the Minimum Wage Board acted without authority and ultra vires in fixing to driver-salesmen and assistant-salesmen wages per hour or commission instead of commission only, because the Board is not empowered to fix wages per hour to these driver-salesmen and assistant-salesmen in view of their exclusion from the Act which fixes maximum working hours in Puerto Rico; (3) That the employees in question being true "peddlers" the Board cannot fix minimum wages per hour for them; (4) Petitioners, in Appeal J.S.M.-65-2, allege further that the Board acted ultra vires in recommending similar wages and commissions for all Puerto Rico without making distinctions on the basis of zones between plants operating in the metropolitan zone and those which, like petitioners, operated outside that zone and specifically in the southern and western part of Puerto Rico. In synthesis, they attack the validity of Mandatory Decree No. 27 inasmuch as it fixes to these employees minimum compensation per working hour or on the basis of commission or piece rate, whichever is higher, and not only on the basis of commission, since the Board is not empowered by law to fix the compensation per hour.

We shall examine the question posed. On March 5, 1965, the Committee which investigated the Dairy and Cattle In-

dustry submitted to the Minimum Wage Board, and it was published by the latter, the proposed Mandatory Decree No. 27. On April 2 and 5, 1965, petitioners appeared, respectively, before the Board and filed their objections to the approval of said proposed decree. Among other objections, they maintained from the beginning that the Committee lacked power to fix a minimum wage per hour inasmuch as these driver-salesmen and assistant-salesmen resembled the travelling agents and peddlers mentioned in § 19 of Act No. 379 of 1948 which establishes the legal working day and working conditions, and which Act No. 379 itself excluded from its provisions.[1] The Board dismissed the objections and on April 20, 1965 it approved the Decree and published its approval on April 24.

On May 3 and 4, 1965 petitioners requested the Board to reconsider its approval of the Decree. While the reconsideration was pending, on May 26, 1965 petitioners (J.S.M.-65-1) appeared before the Board and called its attention to the fact that on March 10, 1965 Bill No. 135 excluding driver-salesmen and assistant-salesmen object of the Decree from the application of the acts and decrees governing maximum working hours had been filed in the House of Representatives. That said bill had been approved by both houses and was pending to be signed by the Governor. On July 14, 1965 petitioners themselves informed the Board that the Governor had signed H.B. No. 135 which became Act No. 114 of 1965. They requested the Board to remand the Decree to the Committee in order to consider it in the light of Act No. 114. On September 10, 1965, the Board denied peti-

---

[1] Apparently petitioners lost sight of the fact that unlike the Minimum Wage Committees under the Minimum Wage Act of 1941, the Committees and the Board under the Minimum Wage Act of 1956 have nothing to do with working days and other working conditions. Although it is true that in Mandatory Decree No. 27 provisions as to working conditions are reproduced, it was by virtue of mandatory decrees promulgated under the Act of 1941 that the Act of 1956 left them in effect.

tioners' motions for reconsideration and maintained in full force and effect Mandatory Decree No. 27. Petitioners then appealed to this Court for review.

In the Declaration of Policy of the Minimum Wage Act of Puerto Rico—Act No. 96 of June 26, 1956, § 1—it is set forth that it is the policy of the Legislature that the proceedings authorized by said act for the fixing and revision of minimum wages be conducted in a *quasi-legislative* manner; and any decree approved by the Board shall have the force of law.—Section 13 (c)—. Section 29 provides that the *findings of fact* at which a Minimum Wage Committee, acting within its powers, may arrive, shall, in the absence of fraud, be *conclusive*. This Court may annul or remand to the Board a decree only on the ground that the Minimum Wage Committee acted without authority or ultra vires, or because the Board acted without authority or ultra vires, or because the decree was procured through *fraud*.

The foregoing expressions of the lawmaker constitute guides to be taken into account in the exercise of our reviewing function in this type of proceedings.

■ There is nothing in the Minimum Wage Act of 1956 to deny power to a Committee or to the Board to fix a minimum wage on the basis of an hour of work as a unit of measure, in any industry or activity and with respect to any employee or occupation. On the contrary, the working hour has always been the basic measure par excellence in all our labor legislation fixing wages. Even though it had not been historically so, it is sufficient with Act No. 56 itself, which uses no other standard to fix the minimum wages it fixes but the working hour.

The Legislature, however, being aware that special situations could arise which would call for a different treatment, granted the Committees in § 16 of the Act ample discretion to handle such situations. Thus, for example, it granted discretion to the Committees to classify the work according

to the nature of the services rendered; to make classifications for different types of jobs; to recommend different wages for different districts or regions or for various categories or classes of the same industry if such differentiation, according to the Committee's judgment, may be advisable because of existing conditions. Section 16 expressly provides that in the bean-picking of the agricultural phase of the coffee industry and in the leaf-stringing in the tobacco industry, *as well as in any other economic activity*, the committees may recommend and the Board may fix minimum wages by *units of work* instead of wage rates *per hour*, or *alternatively*, whenever they may deem it advisable due to the nature of the work to be done.

Consistent with the foregoing, when fixing the wage for these driver-salesmen and assistant-salesmen in the alternative, per hour or on the basis of commission per unit of sale, whichever might be higher, the Committee probably considered, and in the use of its ample discretional power it applied the remedy it believed appropriate, that if it fixed the wage per hour only it could result in an injustice to the employer, since in one hour the driver might sell a quart of milk, and it likewise considered that if it were fixed on the basis of commission per unit only, it could be adverse to the employee, if for extraneous reasons such as traffic problems, breakage of the vehicle, or something like that, in a whole working day he could not deliver a substantial number of quarts.

In view of the foregoing, it is shown beyond reasonable doubt, not even remote, that the Committee and the Minimum Wage Board had in this case plenary power to fix in Mandatory Decree No. 27 a minimum compensation for these employees per hour or on the basis of commission per unit, whichever produces a higher minimum wage. Man-

datory Decree No. 27, in the light of that challenge, is entirely valid.[2]

It remains for us to consider whether Act No. 114 of June 30, 1965 altered the power of the Committee and of the Board to fix minimum compensation in the manner stated or whether it divested the Committee and the Board of the legal power they had to do so.

Act No. 114 speaks for itself. Its purpose and the reasons of the lawmaker to adopt it are clearly and precisely stated in its text. Its title is "To decree the nonapplicability of the laws and decrees *on maximum working hours* to milkmen and their helpers, in their peddling of fresh milk and other dairy products; . . . ." (Italics ours.) In its Statement of Motives it is set forth that traditionally, the milk industry of Puerto Rico has been employing milkmen and milkmen helpers to peddle and deliver fresh milk; that these peddlers and their helpers perform their task without direct supervision, their employer being unable to regulate or ascertain the hours actually worked by them; that they are the only ones who really know the clientage and act according to their judgment to keep and increase it; that they render their services outside of the milk plants and go back to the milk plants for the sole purposes of returning the property and settling the accounts, and that as a matter of fact they are *true peddlers*. The Statement of Motives of Act No. 114 continues stating that doubt has arisen as to whether or not these employees are covered by the exemption granted to traveling salesmen established by our laws with regard to

---

[2] The Board concluded relying on the evidence in the record, that seven of petitioner enterprises used the system of payment per unit, four of them paid per hour, and one used independent contractors for the distribution. Six of the petitioners had collective bargaining agreements with the employees and five of them paid on the basis of units delivered, varying the rate of payment according to the distribution of the milk, door-to-door or to business establishments.

*maximum* daily or weekly *periods of work.*[3] That this doubt has aroused a state of unrest in the industry and in view of the possibility of future claims for *extra hours worked* which undermine the stability of the industry itself, it becomes desirable that any possible doubt existing in the minds of the said milkmen and their helpers as to the applicability of the laws and decrees concerning *maximum labor periods* be dispelled. That it is imperative, however, that milkmen be guaranteed adequate pay on the basis of minimum commissions to be set by the Minimum Wage Board; and that they should also be guaranteed the rights so far enjoyed as to leave of absence, a seventh day of rest, sick leave, and other work conditions guaranteed to the other employees of the milk industry.

Following such Statement of Motives Act No. 114 provides in its § 1 that the laws and decrees establishing *maximum working periods* for employees in the milk and cattle industries, or in any manner regulating the *maximum working hours* of the employees of such industries, shall not be applicable to milkmen and their helpers, in their peddling of fresh milk and other dairy products. What this § 1 actually provided is that these employees are not covered by the protection as to maximum working day granted by Act No. 379 of 1948. In other words, that these peddlers of fresh milk and other dairy products and their helpers could work in excess of the maximum of 8 hours of the working day fixed by this Act without the obligation to pay them the double compensation per hour fixed by said statute subject, of course, to the guarantee offered by § 16 of the Bill of Rights of the Constitution of the Commonwealth of Puerto Rico of an extra compensation of at least one and one-half

---

[3] Reference is to Act No. 379 of 1948 concerning working day, particularly in its § 19.

times the regular wage rate for work performed in excess of 8 hours.

Section 2 of Act No. 114 provides that the minimum wage committees *may* recommend, and the Minimum Wage Board *may* approve, in the decrees applicable to the milk industry, minimum commissions to be paid to peddlers of fresh milk and other dairy products and their helpers. It would be necessary to force deliberately the language of said § 2 and, what is even more, the raison d'être of the statute, in order to conclude that it deprived the Committee and the Board of the power they had, granted by the Minimum Wage Act, to fix minimum wages to these employees, per working hour. Under known rules of construction, it is possible sometimes to interpret mandatorily terms permitted in a statute such as "may", but usually this is so when the principal aim or purpose of the statute is that the thing permitted be done. In any event, the Committee fixed wages on the basis of commissions also. The principal aim or purpose of Act No. 114 is not to grant power to the Committees and to the Minimum Wage Board so that they can fix compensation on the basis of commissions to these employees. Act No. 114 was not necessary for that purpose because they already had been given full power by virtue of Minimum Wage Act No. 96 itself, particularly its § 16 to which we referred hereinbefore. The principal purpose of Act No. 114 was to take these employees out of the protection granted by Act No. 379 of 1948 on *maximum working day* for the reasons expressed by the lawmaker himself:— the difficulty of the employer to supervise adequately the work of said employees performed outside the premises. The position assumed by petitioners to the effect that Mandatory Decree No. 27 clashes with and is contradictory to Act No. 114 of 1965 is, then, untenable. We already said at the beginning that the committees and the Minimum Wage Board under Act No. 96 of 1956 have nothing to do and have no function

to perform in regard to *working day* and other working conditions. In the light of this second contention we ratify likewise the validity of the Decree.

On appeal J.S.M.65-2 petitioners raise the additional point that the Decree is not valid because in fixing the minimum wage of these employees it did not distinguish between plants operating in the metropolitan zone and others, like themselves, which operate in other parts of the Island, particularly in the southern and western zones of Puerto Rico. In their brief on the merits petitioners in fact abandoned this challenge in not deeming necessary the discussion thereof because they believed that the Mandatory Decree would be set aside in the light of the other challenges. This notwithstanding and in order not to leave a doubt on that matter, we shall say that § 16 of the Minimum Wage Act grants the Committee and the Board the power to make such distinctions on the basis of zones when, in their judgment such a distinction might be advisable on the basis of the conditions existing between the zones or regions and provided such action does not allow competitive advantages to other zones or regions. In the Minimum Wage Committees the employers, the employees, and the public interest are represented. If in this case the Committee did not deem it proper to make use of that power and to fix a different wage for enterprises in the metropolitan zone and for those operating in other parts of the Island, it probably believed that it was not advisable or justified to make such distinction in the light of the facts. As to the exercise or nonexercise of such views this Court has no reviewing power at all.

On the foregoing grounds judgment will be rendered providing that Mandatory Decree No. 27 applicable to the Dairy and Cattle Industry, Third Revision (1965) is valid and it is affirmed.

Mr. Justice Blanco Lugo dissented in a separate opinion in which Mr. Justice Pérez Pimentel, Mr. Justice Rigau, and Mr. Justice Ramírez Bages concur.

—O—

MR. JUSTICE BLANCO LUGO, with whom MR. JUSTICE PÉREZ PIMENTEL, MR. JUSTICE RIGAU, and MR. JUSTICE RAMÍREZ BAGES concur, dissenting.

San Juan, Puerto Rico, June 20, 1967

I

It is not until the third revision of Mandatory Decree No. 27 for the Dairy and Cattle Industry, 29 R.&R.P.R. § 245n–491 *et seq.*, is approved on April 20, 1965 that the Minimum Wage Board of Puerto Rico fixed an alternative compensation to driver-salesmen and assistant-salesmen of wage per hour or piece rate on the basis of a commission for the number of quarts of milk sold in door-to-door distribution or in distribution to business establishments. Both under the original Decree No. 18, approved November 27, 1950, 29 R.&R.P.R. § 245n–311 *et seq.*, and under Decree No. 27 of July 5, 1957, and in its first and second revisions of March 23, 1960 and April 19, 1962 respectively, the fixing of compensation for said employees had been made on the basis of wage per hour exclusively.[1] Each one of these decrees contained provisions concerning working conditions in

---

[1]

| | Wage Rate per Hour | |
| --- | --- | --- |
| | Zone I | Zone II |
| Decree No. 18 | $0.35 | $0.30 |
| Decree No. 27 | $0.60 | |
| First Revision (1960) | 0.65 | |
| Second Revision (1962) | 0.74 | |

relation to maximum working periods, weekly rest day, vacations, sick leave, and others.

Of special interest is the provision concerning maximum working periods—it only reiterates what was prescribed in § 4 of Act No. 379 of May 15, 1948, 29 L.P.R.A. § 273— to the effect that "No employer shall employ any workers whatsoever in the agricultural or industrial phase of the dairy industry for more than 8 hours in any day or for more than 48 hours in any week, unless he pays said worker for the hours worked in excess of 8 hours daily or 48 hours weekly at a rate of at least twice the wage rate he is then earning." Pursuant to § 40(b) of the Minimum Wage Act of 1956, 29 L.P.R.A. § 246k, this provision, as well as all the others to which we have referred, subsisted in full force and effect despite the fact that the Board subsequently varied the rates of minimum wages. *Campos Encarnación* v. *Sepúlveda, ante,* p. 72; *Martín Santos* v. *Urban Renewal and Housing Corporation,* 89 P.R.R. 173 (1963).

Act No. 114 of June 30, 1965 (Sess. Laws, p. 319), 5 L.P.R.A. § 1120 (1966 Suppl., p. 80), was approved for the purpose of, as its title reads, decreeing "the nonapplicability of the laws and *decrees* on maximum working hours to milkmen and their helpers, in their peddling of fresh milk . . . to authorize milk industry and cattle industry committees to recommend to the Minimum Wage Board and the latter to approve minimum commissions for such employees; to guarantee to milkmen and their helpers a seventh day for rest, leave of absence, sick leave, and other work conditions guaranteed to the other workers of the milk and cattle industries."

It is imperative to copy entirely the statement of motives of this Act:

"Traditionally, the milk industry of Puerto Rico has been employing milkmen and milkmen helpers to peddle and deliver

fresh milk and other dairy products. These peddlers and their helpers perform their task without direct supervision, their employer being thus unable to regulate or ascertain the hours actually worked by them; they are the ones who sell the product, provide the service and attention, and act according to their own judgment to keep and increase their clientage, and they are the only ones who really know such clientage; they render their services outside of the milk plants; go back to the milk plants for the sole purposes of returning the property and settling the accounts of the milk and other dairy products sold, and they are, in fact, peddlers.

"Traditionally, milkmen and their helpers have been compensated on the basis of a commission for each quart of milk sold, regardless of the actual hours worked, a compensation system which has turned out to be fair and reasonable, and has met with the approval of such milkmen and their helpers. Some doubt has arisen, though, as to whether or not such peddlers are covered by the exemption granted to traveling salesmen established by our laws with regard to maximum daily or weekly periods of work. This doubt has aroused a state of uncertainty in the milk and cattle industries, in the light of possible future claims for extra hours worked, and threatens the stability of the industries themselves, and labor-management relationships. It becomes, thus, desirable, so that the growth and expansion of the milk and cattle industries may not be deterred, that any possible doubt existing in the minds of the said milkmen and their helpers as to the applicability of the laws and decrees concerning maximum labor periods be dispelled.

"It is imperative, however, that milkmen be guaranteed adequate compensation on the basis of minimum commissions to be set by the Minimum Wage Board upon recommendation of the committees designated to set the minimum wage to be paid in the milk industry. They should also be guaranteed the rights so far enjoyed as to leave of absence, a seventh day for rest, sick leave, and other work conditions guaranteed to the other employees of the milk and cattle industries."

With this history in mind, which was the real purpose of the Legislature in approving Act No. 114?

## II

The majority opinion upholds the Board's action in fixing the alternative compensation on the ground that: (a) it cannot be affirmed that the legislative intent in approving Act No. 114 was to grant to said agency the power to fix wages on the basis of commission since § 16 of the Minimum Wage Act authorized, ever since 1964, the fixing of minimum wages by piece rates instead of wage rates per hour or alternatively in *any economic activity;*[2] (b) the only effect of the cited act is that the employees to which it refers are not covered by the protection concerning the maximum workday granted by Act No. 379, *supra*, but specifically affirms that they could work more than eight hours daily and more than forty-eight hours weekly receiving compensation only at a rate of one and one-half times for those extra hours, pursuant to the constitutional mandate, Art. II, § 16, of the Constitution of the Commonwealth of Puerto Rico.

An examination of Act No. 114 and the effect of all its provisions, analyzed as a whole and separately, lead me to a different conclusion. Let us see. Said act seeks to declare the nonapplicability of the laws—obviously Act No. 379— and decrees on maximum working hours to milkmen and their helpers. It is true that no express reference is made

---

[2] Section 13 of the Minimum Wage Act of 1941, 29 L.P.R.A. § 224, expressly authorizes the fixing of wages by labor units, but when the Act of 1956 was approved a similar provision was omitted. It is in 1959, by Act No. 4 of May 8 (Sess. Laws, p. 14), that specifically a provision to that effect is incorporated but limited to the coffee harvest in the agricultural phase of the coffee industry; by Act No. 49 of June 6, 1963 (Sess. Laws, p. 75), leaf-sewing in the tobacco industry was also included; and finally, by Act No. 105 of June 26, 1964 (Sess. Laws, p. 324), such power is extended to "any other economic activity." 18 Journal of Proceedings 1790.

It is significant that until this last Act of 1964 the fixing of wages was not authorized in an alternative manner, but the committees could fix minimum wages per units of work *instead of* wage rates per hour, when it was advisable because of the nature of the tasks to be performed.

to the nonapplicability of the Minimum Wage Act as regards the fixing of wages. But it was unnecessary considering that (1) until then, as it appears from the foregoing history, the wages were being fixed per hour and tied in the decree itself to the guarantee of double pay; (2) since 1954 the function of the Board is limited to fixing minimum wages and has no intervention in the framing of other working conditions, among them the maximum workday, *Marrero Cabrera* v. *Caribbean Refining Co.*, 93 P.R.R. 246 (1966). Because of that—in excluding them also from the fixing of wages per hour—it is necessary to state that "It is imperative, *however*, that milkmen be guaranteed adequate compensation on the basis of minimum commissions to be set by the Minimum Wage Board." What need was there of reiterating a power which the Board admittedly had? The only logical explanation is that they had been excluded from the fixing of wages per hour. Note likewise that the power to fix wages on the basis of commission is preceded by the adverb *however*, meaning that the action of the Board was not entirely prohibited, but was limited to that specific manner which was authorized. On the other hand, the Act provides that "They should *also* be guaranteed the rights *so far* enjoyed as to leave of absence, a seventh day for rest, sick leave, and other work conditions guaranteed to the other employees of the milk and cattle industries." Again, the only logical explanation is that they were excluded from the ambit of the action of the Board in incorporating as part of the decrees, pursuant to § 40(b), 29 L.P.R.A. § 246k, working conditions concerning leave of absence and sick leave. All this shows that the sole purpose could not have been, as indicated in the majority opinion, to exclude these employees from the provisions on overtime.

In view of the constitutional mandate already cited,[3] *A. D. Miranda, Inc.* v. *Falcón*, 83 P.R.R. 708 (1961); *cf. Communications Authority* v. *Superior Court* (on reconsideration), 87 P.R.R. 1 (1963), and obviously to reconcile it to its provisions, the majority opinion is compelled to recognize that when driver-salesmen and assistant-salesmen work on the basis of a wage per hour they shall be entitled to receive overtime pay at the rate, at least, of time and a half the regular rate. *This position frustrates with crystal clearness one of the announced legislative purposes in approving Act No. 114*, to wit, *that these employees would not be subject to the laws concerning maximum labor periods* and their consequence of pay at a higher rate when work is performed in excess of the legal workday. Precisely, conscious of the constitutional limitation, the Legislature provided the only manner in which its purpose could be achieved: the payment of wages on the basis of commission. In this manner the protection of these employees was guaranteed through the intervention of the agency in fixing their wages, but on the basis of commission only.

Because of having acted beyond its legal power I would annul that part of the decree of the Minimum Wage Board which fixes a wage per hour to the driver-salesmen and assistant-salesmen in the phase of distribution of the dairy industry.[4]

---

[3] "The right of every employee . . . is recognized, . . . to an ordinary workday which shall not exceed eight hours. An employee may work in excess of this daily limit only if he is paid extra compensation as provided by law, at a rate *never* less than one and one-half times the regular rate at which he is employed."

[4] I am fully aware that the salesmen on commission who are engaged in opening routes may be prejudiced with the fixing of a wage on commission only. However, nothing precludes the incorporation, by way of collective bargaining or in the decree itself of a provision, for these cases, guaranteeing a minimum compensation irrespective of the number of quarts distributed. At the hearing held the representatives of the enterprises accepted it so and suggested that the case be remanded to the

Board with instructions to refer it to the Committee for the purposes of making a determination to that effect.